UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN RAGEN, | : | |
| Plaintiff, | : | Civil No. 3:16-CV-01433 |
| v. | : | |
| | : | (Judge Kane) |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner of | : | |
| Social Security | : | |
| Defendant. | : | |

**MEMORANDUM**

The above-captioned action is one seeking review of a decision of the Acting Commissioner of Social Security ("Commissioner")[1], denying Plaintiff John Ragen's application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI. For the reasons set forth below, we will vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

**I. BACKGROUND**

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Ragen met the insured status requirements of the Social

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted for Carolyn W. Colvin, Acting Commissioner of Social Security as the defendant in this suit.

1

Security Act through December 31, 2013. (Tr. 25).[2]

SSI is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Ragen applied protectively for DIB on May 20, 2013 and SSI on May 3, 2013, alleging disability for both claims beginning February 7, 2013. (Tr. 23). Ragen's date last insured for purposes of his DIB claim is December 31, 2013. (Tr. 25, 46). His claims were initially denied on August 21, 2013. (Tr. 23, 111-38).

Ragen requested a hearing before the Administrative Law Judge ("ALJ") Office of Disability and Adjudication and Review of the Social Security Administration, and one was held on September 5, 2014. (Tr. 23, 44-90). At the hearing, Ragen was represented by counsel, and a Vocational Expert testified. (Tr. 44-90). On December 11, 2014, the ALJ issued a decision denying Ragen's applications. (Tr. 127-43). Ragen's request for a review with the Appeals Council was denied on May 5, 2016. (Tr. 1-6). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Ragen filed a complaint in this Court on July 11, 2016. (Doc. 1). The Commissioner filed an answer on September 16, 2016. (Doc. 13). After supporting and opposing briefs were submitted (Docs. 15 and 16), the appeal[3] became ripe for disposition.

---

[2] References to "Tr. __" are to pages of the administrative record filed by the Defendant as part of the Answer (Docs. 13 and 14) on September 16, 2016.

[3] Under the Local Rules of Court, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is

2

Ragen was born on June 25, 1971 (Tr. 37), has a limited education, and is able to communicate in English. (Tr. 37). In the past, Ragen worked as a stock person, industrial cleaner, loader/unloader, packager and cleaner/janitor. (Tr. 36, 37). Ragen has not engaged in substantial gainful activity since the alleged onset date of February 7, 2013. (Tr. 25).

The ALJ found Ragen to have the following severe impairments: coronary artery disease, history of myocardial infarction, hypertension, bipolar disorder, anxiety disorder, and cannabis abuse. (Tr. 25).

## II. STANDARD OF REVIEW

When considering a social security appeal, the Court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91 (3d Cir. 2007); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id. The factual findings of the Commissioner, "if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Johnson, 529 F.3d at 200 (3d Cir. 2008) (quoting Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)) (internal quotations and citations omitted). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer v. Apfel, 186 F.3d 422, 427

---

"adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

(3d Cir. 1999) (citing Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995)) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). The United States Court of Appeals for the Third Circuit has stated,

> [O]ur decisions make clear that determination of the existence *vel non* of substantial evidence is not merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (citing Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983); Gilliland v. Heckler, 786 F.2d 178, 183 (3d Cir. 1986)). The Commisioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Gilliland, 786 F.2d at 183 (citing Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981)).

### III. SEQUENTIAL EVALUATION PROCESS

The plaintiff must establish that there is some "medically determinable basis for an impairment that prevents him from engaging in any substantial gainful activity for a statutory twelve-month period." Fargnoli v. Massanari, 247 F.3d 34, 38-39 (3d Cir. 2001) (quoting Plummer, 186 F.3d at 427) (internal quotations omitted). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" Fargnoli, 247 F.3d at 39 (quoting 42

4

U.S.C. § 423(d)(2)(A)). The Commissioner follows a five-step inquiry pursuant to 20 C.F.R. § 404.1520 to determine whether the claimant is disabled. In Plummer, the Third Circuit set out the five-steps:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § [404.]1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140 (1987) . . . . In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).
>
> If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. See 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. See, [sic] Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

Plummer, 186 F.3d at 428.

**IV. STATEMENT OF RELEVANT FACTS**

The ALJ went through each step of the sequential evaluation process and found that (1) Ragen had not engaged in substantial gainful activity since February 7, 2013, the alleged onset date; (2) Ragen had the severe impairments of coronary artery disease, history of myocardial

5

infarction, hypertension, bipolar disorder, anxiety disorder, and cannabis abuse; (3) Ragen's impairments did not meet or equal a listed impairment; (4) Ragen lacked credibility; and (5) Ragen could not perform his past relevant work, but could perform light work with several limitations (Tr. 25-38). Specifically, the ALJ crafted the residual functional capacity ("RFC") of Ragen to:

> occasionally lift and carry up to 20 pounds and frequently carry and lift up to 10 pounds. The claimant can stand and/or walk for up to six hours in an eight-hour workday or be capable of sitting for at least six hours in an eight-hour workday. The claimant can occasionally use his upper and lower extremities for pushing and/or pulling such as operating levers, hand controls, pedals or foot controls. The claimant should not perform any vigorous pushing or pulling with either upper or lower extremities. Claimant could occasionally balance, stoop, crouch, use ramps and climb stairs. The claimant should avoid performing those postural activities repetitively. He should avoid climbing ladders, ropes or scaffolds and avoid occupations that would require crawling. The claimant should avoid concentrated exposure to temperature extremes and to potential pulmonary or respiratory irritants such as fumes, strong odors, dust, gases and work environments with poor ventilation. The claimant should avoid workplace hazards such as unprotected heights and dangerous moving machinery. The claimant can perform work that is unskilled involving only simple, routine tasks and can perform work that is considered low stress involving only occasional simple decision making and requiring only occasional changes in the work duty or work setting. The claimant can have occasional contact with co-workers. He should avoid any teamwork type jobs and should be limited to only rare or incidental contact with customers or members of the general public, if any. The claimant should avoid working in areas that would be subject to crowds of customers or members of the public.

(Tr. 29).

Ragen appeals the ALJ's determination on four grounds: (1) the ALJ failed to find that Ragen's cervical subluxation is a severe impairment; (2) the RFC is unsupported by substantial evidence because the RFC and hypothetical question to the vocational expert did not reflect Ragen's difficulties with concentration, persistence, or pace; (3) the ALJ failed to properly

6

weigh the opinion evidence; and (4) substantial evidence does not support the ALJ's credibility assessment.

**A. Ragen's Impairments**

On January 1, 2013, Ragen was seen by Tiffany Griffiths, Psy.D. for a psychological consultative examination. (Tr. 633). Dr. Griffiths noted that Ragen's symptoms are consistent with major depressive disorder which is recurrent and severe, panic with agoraphobia, and alcohol abuse, in full sustained remission. (Tr. 634). She further noted that his symptoms include insomnia, suicidal thoughts with no current plan, social anxiety, ruminating thoughts, fluctuating mood, irritability, lethargy, social paranoia, poor concentration, poor appetite, psychomotor slowing, and panic. (Id.). On mental examination, Dr. Griffiths observed Ragen to be alert and interactive for the most part, although looking somewhat disheveled; psychomotor slowing was moderate in nature; a depressed mood and blunted affect; a logical and coherent thought process, although it was interrupted by racing thoughts and fear; poor concentration and short term memory; and impulse control and reliability adequate but judgment and insight both poor. (Tr. 635). Dr. Griffiths diagnosed Ragen with major depressive disorder, recurrent and severe, panic with agoraphobia, and alcohol abuse in full sustained remission. (Id.).

On May 1, 2013, Ragen saw Guido Boriosi, M.D., of NHS Human Services ("NHS") for a medication follow-up and prescription refills. (Tr. 646). Dr. Boriosi's notes reveal that Ragen had several superficial lacerations on his forearms because he could not handle the stress. (Id.). On psychiatric examination, Ragen's conversation was noted as spontaneous, coherent and relevant; the rate and amount is less than normal; there is no evidence of loosening of associations, no auditory or visual hallucinations, no delusional ideations; his affect is both

7

depressed and anxious; judgment is fair; insight is partial. (Id.). Ragen denied any suicidal or homicidal ideation but noted that he cuts when he is very anxious. (Id.). Dr. Boriosi further notes that Ragen's symptoms have worsened since he was last seen and is not making progress towards his treatment plan goals. (Tr. 646-47). His diagnosis was bipolar disorder and assessed him with a global assessment functioning ("GAF") score of 55. (Tr. 647).

Ragen presented to an urgent care in early June, 2013 for complaints of shoulder pain. (Tr. 664). He was sent to the ER for labs, an EKG, and xrays and was informed to follow-up with his doctor at the Carbondale Family Health Center. (Id.). On June 12, 2013, Ragen was seen at the Carbondale Family Health center and was documented as having an elevated blood pressure and very nervous. (Id.). On examination, his left shoulder revealed limited forward flexion to 45 degrees, limited abduction due to pain in scaular area, minimal spasms in the trapezius, and tenderness in the lower body of the trapezius. (Tr. 665). Psychiatrically, he was anxious. (Tr. 666). Ragen was instructed to follow-up in a week and to get labs and an EKG. (Tr. 666-67).

Ragen had an electrocardiogram at Moses Taylor Hospital on June 13, 2013 that revealed normal sinus rhythm and prominent anterior forces. (Tr. 834). On that same day, Ragen was voluntarily admitted to Geisinger Community Medical Center because of severe depression, suicide attempt, and not being able to contract for safety. (Tr. 780). During hospitalization, diagnostic impression included bipolar disorder, mixed, hypertension, history of coronary artery disease, and severe, multiple social, financial, and interpersonal problems. (Tr. 781). Ragen received individual, group, milieu, activity, recreational and pharmacotherapy. (Tr. 776). He was discharged on June 17, 2013, with a principal diagnosis of bipolar disorder and advised to

8

follow-up with treatment at NHS. (Id.).

Ragen had a follow-up visit with Carbondale Family Health Center on June 21, 2013. (Tr. 827). The medical notes show that he was doing well with the adjustment of his medications, that his shoulder no longer hurt, his blood pressure was stable, and that he did not have any suicidal or homicidal ideation. (Id.). Impression was hypertension. (Tr. 829).

On December 18, 2013, Ragen was admitted to Wilkes-Barre Behavioral Hospital due to an overdose of an unknown amount of Ativan in order to stop the voices that were bothering him. (Tr. 842). Psychiatric evaluation notes state that Ragen had been banging his head to the wall to stop the voices which had command auditory hallucination asking him to hurt himself. (Id.). While hospitalized, Ragen was treated with milieu, group, and individual therapy. (Tr. 839). Ragen was discharged on December 24, 2013 since he was doing well and auditory hallucination improved without having any suicidal or homicidal ideation. (Tr. 840). His discharge diagnoses was major depressive disorder, recurrent, severe; anxiety disorder, not otherwise specified; and cannabis abuse. (Tr. 839).

Ragen had a follow-up visit at Carbondale Family Health Center for hypertension and coronary artery disease on January 6, 2014. (Tr. 793). The medical notes indicate that he has been doing well with physical therapy, his coronary artery disease had been stable and he was doing well with current medications, and reported no chest pain or dyspnea. (Id.). His hypertension was stable and he tolerated the medications and had no palpitations, leg edema, or calf pain. (Id.). On physical examination, Ragen was noted as being tender over para verterbral muscles with minimum spasms noted and distally limited flexion to 30 degrees. (Tr. 795). Impression was hypertension and coronary artery disease. (Tr. 796).

Ragen was next seen on January 9, 2014 by Satish Mallik, M.D. of NHS. (Tr. 721). Dr. Mallik notes that Ragen feels that the medications Celexa, Risperdal, Trazodone, and Ativan are working and helping him but not all the way because he still struggles with sleep and anxiety. (Id.). Dr. Mallik further notes that Ragen tends to avoid being exposed to crowds and is somewhat suspicious and paranoid at times, but denied any suicidal thinking. (Id.). Dr. Mallik increased his Trazodone and his Risperdal and indicated the ongoing medical need for the treatment of Ragen's depression, major depressive disorder. (Id.).

On a medication follow-up visit at NHS on April 16, 2014,[4] Ragen stated that he "was not doing good." (Tr. 716). He complained of racing thoughts, banging his head on the wall, pulling his hair out, growling, having nightmares and being increasingly angry off and on. (Id.). The medical notes further provide that Ragen's sleep was poor and appetite was down; that he also complains of hallucinations, seeing shadows and having voices whisper to him, telling him he does not belong here and that he should get out of here; and that he is suicidal off and on. (Id.). On psychiatric examination, Ragen's mood was depressed and affect was appropriate. (Tr. 717). His thought processes were intact and his associations were normal. (Id.). His thought content noted auditory and visual hallucinations. (Id.). Ragen denied suicidal or homicidal ideations. (Id.).

Ragen was again admitted to Geisinger Community Medical Center on June 18, 2014 due to a sudden onset of chest pain, retrosternal with radiation to the left arm. (Tr. 757). Ragen's condition stabilized and he was discharged on June 20, 2014, with discharge diagnoses of chest

---

[4] The Court notes that the ALJ incorrectly noted the date for this medication follow-up visit as August 13, 2014, rather than April 16, 2014. August 13, 2014 appears to be the date the records were transmitted. (Tr. 706, 716-19).

pain, hypertension, dyslipidemia, coronary artery disease, myocardial infarction, depression and bipolar I disorder. (Tr. 738).

On July 24, 2014, Ragen was seen at Carbondale Family Health Center for a requested visit. (Tr. 783). Medical notes show that Ragen has been very noncompliant with follow-up and routine labs. (Id.). Ragen's hypertension was noted as stable on that day, that he tolerated his medications without significant side effects, and that he had some depression but was tolerable. (Id.).

**B. Residual Functional Capacity and Mental Capacity Assessments**

On January 26, 2013, Tiffany Griffiths, Psy.D, completed a medical source statement after conducting a psychological consultative examination. (Tr. 633, 640). Dr. Griffiths opined that Ragen had moderate limitations in carrying out short, simple instructions, and marked limitations in carrying out detailed instructions and making judgments on simple work-related decision. (Id.). She further opined that he has moderate limitations in interacting appropriately with the public, supervisors, and co-workers, and marked limitations in responding appropriately to work pressures in a usual work setting and to changes in a routine work setting. (Id.). The ALJ neither mentioned nor discussed this medical opinion in his decision.

On July 11, 2013, Anne Zaydon, M.D., a State Agency medical consultant, reviewed Ragen's medical records and completed a physical residual functional capacity assessment. (Tr. 111-36). Dr. Zaydon opined that claimant is capable of occasionally lifting/carrying up to 50 pounds and frequently lifting/carrying up to 25 pounds. (Tr. 118, 131). Dr. Zaydon stated that Ragen could stand and/or walk for a total of 6 hours in an 8-hour workday and could sit for 6 hours in an 8-hour workday. (Id.). Dr. Zaydon opined that Ragen could push and/or pull

11

unlimited, other than shown, for lift and/or carry. (Id.). Dr. Zaydon also provided that Ragen could frequently climb ramps, stairs, ladders, ropes, and scaffolds, and has unlimited postural limitations in stooping, kneeling, crouching, and crawling. (Id.). The ALJ gave moderate weight to this opinion; however, he also gave Ragen "some greater benefit of the doubt[,] and in considering his medical history and combination of impairments limited him to light work." (Tr. 35).

On August 19, 2013, Melissa Diorio, Psy.D., a State Agency psychological consultant, reviewed Ragen's medical records and completed a mental residual functional capacity assessment. (Tr. 111-36). Dr. Diorio opined that Ragen is moderately limited in his ability to understand and remember detailed instructions. (Tr. 120, 133). As for Ragen's sustained concentration and persistence limitations, Dr. Diorio opined that he is moderately limited in his ability to: carry out detailed instructions; maintain attention and concentration for extended periods; make simple-work-related decision; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id.). Dr. Diorio also provides that Ragen is moderately limited in his ability to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 121, 134). Lastly, Dr. Diorio opined that Ragen is moderately limited in his ability to respond appropriately to changes in the work setting and in his ability to set realistic goals or make plans independently of others. (Id.). The ALJ accorded great weight to this opinion because it was

12

consistent with the medical evidence when considered in its entirety, including the mental health treatment records. (Tr. 36).

On September 25, 2013, David Yatsonsky, M.D., of Carbondale Family Health Center and Ragen's treating physician, completed a residual functional capacity assessment. (Tr. 696-97). Dr. Yatsonsky stated that Ragen has a diagnosis of coronary artery disease, hypertension, neck pain, back pain, depression, left knee pain, bipolar disease and radiculopathy. (Tr. 696). Dr. Yatsonsky opined that Ragen's symptoms associated with his impairments are severe enough to constantly interfere with his attention and concentration required to perform simple work-related tasks, and that he would need to recline or lie down in excess of the typical breaks in an 8-hour workday. (Id.). Dr. Yatsonsky stated that Ragen would only be able to walk one city block before needing to rest or having significant pain and that he could sit a total of four hours and stand/walk for a total of one hour during an 8-hour workday. (Tr. 696).

Dr. Yatsonsky also opined that Ragen would need to take unscheduled breaks four to five times during an 8-hour workday for 20 minutes before returning to work. (Id.). In terms of a competitive work situation, Dr. Yatsonsky opined that Ragen could lift and carry less than 10 pounds frequently and 10 pounds occasionally, and that he would be absent from work as a result of his impairments or treatment more than four times a month. (Tr. 697). The ALJ accorded this opinion limited weight since the "rather extreme limitations are not well-supported by the objective medical evidence, treatment history or clinical findings of record." (Tr. 33).

Satish Mallik, M.D. of NHS completed a mental capacity assessment on March 24, 2014. (Tr. 699-701). Dr. Mallik opined that Ragen has marked limitations in his ability to remember locations and work-like procedures and his ability to understand and remember detailed

13

instructions. (Tr. 699). With regard to Ragen's sustained concentration and persistence, Dr. Mallik opined that he has moderate limitations in the ability to carry out very short and simple instructions; marked limitations in the ability to carry out detailed instructions; and extreme limitations in the ability to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday without interruptions from psychologically based symptoms; complete a normal workweek without interruptions form psychologically based symptoms; and perform at a consistent pace with a standard number and length of rest periods. (Tr. 699-700). In an average month, Dr. Mallik opined that Ragen would have four or more absences. (Tr. 700).

Dr. Mallik also provided that Ragen had extreme limitations in social interaction; marked limitations in the ability to respond appropriately to changes in the work setting and be aware of normal hazards and take appropriate precautions; and extreme limitations in his ability to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others. (Tr. 700-01). The ALJ assigned limited weight to Dr. Mallik's opinion, stating that it is "not well-supported by treatment history of [her] own records dated January 9, 2014 as no mental status examination was conducted." (Tr. 35).

On August 8, 2014, W. Lawrence Stepczak, M.D., of Carbondale Family Health Center, also completed a residual functional capacity assessment. (Tr. 703-05). Dr. Stepczak opined that Ragen's symptoms associated with his impairments are severe enough to frequently interfere with his attention and concentration required to perform simple work-related tasks, and that he

14

would need to recline or lie down in excess of the typical breaks in an 8-hour workday. (Tr. 703). Dr. Stepczak stated that Ragen would only be able to walk one city block before needing to rest or having significant pain and that he could sit a total of five hours and stand/walk for a total of three hours during an 8-hour workday. (Id). Dr. Stepczak also opined that Ragen would need to take unscheduled breaks every two hours for ten minutes during an 8-hour workday before returning to work. (Id.).

In terms of a competitive work situation, Dr. Stepczak opined that Ragen could lift and carry less than 10 pounds frequently and 10 pounds frequently. (Tr. 704). As a result of Ragen's impairments or treatment, Dr. Stepczak opined that Ragen would be absent from work more than four times a month and that he is physically incapable of working an 8-hour day, five days a week on a sustained basis. (Id.). The ALJ accorded limited weight to Dr. Stepcak's opinions regarding sedentary limitations, the need for breaks and the absences because "they are not well-supported by the evidence of record." (Tr. 34). The ALJ did not articulate what weight he gave to the remaining portions of Dr. Stepcak's opinion.

Finally, while Guido Boriosi, M.D. of NHS did not complete a mental capacity assessment form, the ALJ assigned moderate weight to the GAF score of 55 that was contained within Dr. Boriosi's treatment records dated May 1, 2013. (Tr. 34).

**VI. DISCUSSION**

The Court will initially address Ragen's argument that the ALJ failed to properly weigh the opinion evidence, as remand is necessary on this basis. We will further instruct that the Commissioner consider Ragen's other contentions on remand when re-evaluating the claims.

Ragen primarily argues that the ALJ erred in failing to accord greater weight to the

15

opinion of his treating physicians, specifically, Dr. Yatsonsky, as well as failing to even address Dr. Griffiths' medical opinion. The Commissioner asserts that the ALJ provided sufficient reasons for discounting Dr. Yatsonsky's opinion, and that even if the ALJ erred in not weighing Dr. Griffiths' opinion, Dr. Diorio, the State Agency psychological consultant, reviewed Ragen's medical records which contained Dr. Griffiths' opinion.

The ALJ must consider all of the relevant evidence and give a clear explanation to support his or her findings when determining the RFC. Fargnoli, 247 F.3d at 40, 41 (quoting Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000)). A treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record . . . ." Johnson, 529 F.3d at 202 (quoting Fargnoli, 247 F.3d at 43 (quoting 20 C.F.R. § 404.1527(d)(2))) (internal quotations omitted). If a treating physician's opinion conflicts with an opinion of a non-treating physician, the ALJ may reject the treating physician's opinion " 'only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." Id. (quoting Plummer, 186 F.3d at 429).

The Third Circuit " 'has consistently held that it is improper for an ALJ to credit the testimony of a consulting physician who has not examined the claimant when such testimony conflicts with testimony of the claimant's treating physician[.]' " Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 357 (3d Cir. 2008) (quoting Dorf v. Bowen, 794 F.2d 896, 901 (3d Cir. 1986). The ALJ determines what weight to give a medical opinion by considering factors such as the examining relationship, the length of the treatment relationship and frequency of visits,

nature and extent of the treatment relationship, whether the medical source supports the opinion with medical evidence, whether the opinion is consistent with the record as a whole, and the medical source's specialization. 20 C.F.R. § 404.1527(c)(1-5). If the ALJ discounts certain evidence, he must give some indication of the reasons for discounting that evidence. Fargnoli, 247 F.3d at 43.

The ALJ accorded limited weight to Dr. Yatsonky's opinion on the basis that his opinions are "rather extreme ... [and] are not well-supported by the objective medical evidence, treatment history or clinical findings of record." (Tr. 33). Such limited discussion does not permit adequate review of the ALJ's findings. Such a conclusory statement may have sufficed had the ALJ discussed all of the relevant evidence. However, the ALJ omitted discussion of relevant evidence; for example, the ALJ did not discuss, or even reference, any of the physical therapy notes of therapist Michelle McGregor, to whom Ragen was referred to by his treating physician. Michelle McGregor's notes indicate Ragen has pain with mobility, decreased hip, left knee and ankle range of motion in his gait, decreased stance time, poor balance, and positive straight leg test on his left side and a positive femoral nerve tension on his left side. (Tr. 805). Moreover, the ALJ failed to address the consistency of Dr. Yatsonky's opinion with that of Ragen's other physician, Dr. Stepczak's opinion, setting forth almost identical limitations. (Tr. 703). Such relevant evidence may well have supported Dr. Yatsonky's conclusions, and certainly was not inconsistent with his findings and opinion. Without any discussion of this evidence, it cannot be determined "if significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). Consequently, the ALJ's decision was not supprted by substantial evidence.

17

Additionally, the ALJ never acknowledged the medical opinion of Dr. Griffiths. This is contrary to the duty of the ALJ. An ALJ must acknowledge and weigh every medical opinion. 20 C.F.R. § 404.1527(c) ("[W]e will evaluate every medical opinion we receive."); Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) ("The ALJ must consider all the evidence and give some reason for discounting the evidence [he] rejects."). Dr. Griffiths, after conducting a psychological examination, opined that Ragen had moderate limitations in carrying out short, simple instructions, and marked limitations in carrying out detailed instructions and making judgments on simple work-related decision. (Id.). She further opined that he has moderate limitations in interacting appropriately with the public, supervisors, and co-workers, and marked limitations in responding appropriately to work pressures in a usual work setting and to changes in a routine work setting. (Id.).

The Commissioner contends that the psychological record review by Dr. Diorio of the State Agency, explicitly considered Dr. Griffiths' report, and further, that the moving party bears the burden of showing that the ALJ's error in failing to acknowledge Dr. Griffiths' report would have changed the decision. This argument fails for a number of reasons. First, Dr. Griffiths' opinion is consistent with the mental medical opinion of Ragen's other treating physician, Dr. Mallik. Similar to Dr. Griffiths, Dr. Mallik opined that Ragen had marked limitations in understanding and memory, extreme limitations in sustained concentration and persistence, extreme limitations in social interaction, and marked to extreme limitations in adaptation. (Tr. 699-701). Despite this consistency with Ragen's treating physician, the ALJ credited the opinion of the non-examining, consulting physician, Dr. Diorio. However, "it is improper for an ALJ to credit the testimony of a consulting physician who has not examined the claimant when

18

such testimony conflicts with the testimony of the claimant's treating physician." Brownawell, 554 F.3d at 357 (internal citations omitted).

Second, the Third Circuit has not upheld any instance, in any precedential opinion, in which an ALJ has assigned less than controlling weight to an opinion rendered by a treating physician based solely on one opinion from a non-treating, non-examining examiner who did not review *a complete case record*. See Brown v. Astrue, 649 F.3d 193 (3d Cir. 2011); Brownawell, 554 F.3d 352 (holding that three non-treating opinions were not sufficient to reject a treating source medical opinion because they were "perfunctory" and omitted significant objective findings promulgated after the non-treating opinions were issued). The Third Circuit and subsequent cases from this District have held that, especially in an instance in which a condition worsens, "an administrative law judge errs in relying solely on an opinion issued by a non-treating, non-examining physician who has not reviewed a complete case record." Compton v. Colvin, Civ. No. 15-CV-1248, 2016 WL 6471037, at *13 (M.D. Pa. Oct. 31, 2016).

In the case at hand, Dr. Diorio's opinion was rendered on August 19, 2013. This was prior to Dr. Mallik's mental capacity assessment on March 24, 2014, and before a number of hospitalizations and psychiatric appointments occurred. Specifically, Dr. Diorio's opinion was rendered before Ragen was again hospitalized for an overdose of Ativan in order to stop the voices that were bothering him (Tr. 842). Hospital psychiatric evaluation notes provide that Ragen had been banging his head to the wall to stop the voices which had command auditory hallucination asking him to hurt himself. (Id.). Subsequent psychiatric appointments with Dr. Mallik and at NHS reveal that Ragen still struggles with sleep and anxiety, despite the medications, and that he complained of racing thoughts, banging his head on the wall, pulling his

hair out, growling, having nightmares and being increasingly angry off and on. (Tr. 716). The medical notes further provide that Ragen's sleep was poor and appetite was down; that he also complains of hallucinations, seeing shadows and having voices whisper to him, telling him he does not belong here and that he should get out of here; and that he is suicidal off and on. (Id.). On psychiatric examination, Ragen's mood was depressed and affect was appropriate. (Tr. 717). His thought processes were intact and his associations were normal. (Id.). His thought content noted auditory and visual hallucinations. (Id.).

Accordingly, I have determined that the ALJ improperly afforded great weight to the opinion of the non-treating, non-examining physician, Dr. Diorio, in determining Ragen's mental health RFC, because Dr. Diorio issued her opinion before substantial evidence of the record occurred that showed a worsening of Ragen's mental health impairment. Therefore, remand on the foregoing bases are necessary. I decline to address Ragen's other allegation of error, as remand may produce a different result on these claims, making discussion of them moot. Burns v. Colvin, 156 F. Supp. 3d 579, 598 (M.D. Pa. Jan. 13, 2016); see LaSalle v. Comm'r of Soc. Sec., Civ. No. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011). However, because I am remanding the case, I suggest that the Commissioner be sure to evaluate all the evidence regarding Ragen's cervical subluxation, credibility, and concentration, persistence, or pace.

## V. CONCLUSION

Given the foregoing, we find that substantial evidence does not support the ALJ's assessment. Pursuant to 42 U.S.C. § 405(g), we will vacate the Commissioner of Social Security's decision and remand this case for further proceedings. An appropriate order follows.